# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. <u>24-80156-cr-DMM</u>

**UNITED STATES OF AMERICA**

**v.**

**JORGE IBARRA,**

        **Defendant.**

_____/

## <u>GOVERNMENT'S SENTENCING MEMORANDUM IN SUPPORT OF A SENTENCE AT THE LOW END OF THE ADVISORY GUIDELINE RANGE AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A DOWNWARD VARIANCE</u>

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits its *Sentencing Memorandum in Support of a Sentence at the Low End of the Advisory Guideline Range and Response in Opposition to Defendant's Motion for a Downward Variance.* For the reasons herein, a sentence at the low end of the advisory guideline range of 30 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. In support thereof, the government states the following:

## <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Defendant Ibarra tormented two women for years by texting them graphic threats of violence and sexual assault, including threatening to murder one the victim's four-year-old niece[1] (*See* Pre-Sentence Investigation Report ¶ 4-12).[2] He chose his victims from the internet. Both women worked as commentators for an online political news organization (PSR at ¶¶¶¶ 5, 7, 12, 14). After obtaining their personal cell phone numbers, Ibarra utilized a messaging application

---

[1] According to the content of the text messages, Ibarra thought the young girl was Victim 1's daughter.
[2] Pre-Sentencing Investigation Report is referred to hereinafter as "PSR."

(hereinafter "the App") to send the victims threatening messages (PSR ¶ 13).  The App concealed Ibarra's identity by allowing him to send messages through dozens of different phone numbers thereby preventing law enforcement from tracking his identity (PSR ¶¶ 4-5).  On some occasions, Ibarra sent threatening messages during a live online broadcast which referenced the victim's exact location (PSR ¶ 12).  As a result of his conduct, both victims have suffered significant mental and emotional injury and financial loss.[3]

### A.  Victim 1

Ibarra's criminal conduct consists of a years' long campaign of fear and intimidation.  In May 2023, he told Victim 1 that "we have a very close eye on your daughter you fuck up next time … we promise you your never gonna see her again… We know everything about you … you fuck up one more time it's over for your daughter" (PSR ¶ 6).  On that same day, he claimed that "Illuminati Elite team we will be watching today your daughter has your mother's spirit already ok happy early Mother's Day and made sure you show your boobs including your nipples in away (sic) it's not noticeable ok we will tune in" (*Id.*).  In July 2023, he threatened, "We are giving you a heads up because … [Victim 1] will be in the line of fire if she don't follow through in the next 48 hours do not be around her shit is about to get nasty get away now if you are around her" (*Id.*).  In October 2023, he warned, "you better shut the fuck up and stop posting shit on instagram before your lil princess brains is all over the fucking floor" (*Id.*).

In July 2024, Ibarra claimed that the "Illuminating Elite team" had "exclusive nudes of you in the shower and many other places we are gonna expose you and send it to everyone in the Florida rally today everyone's phone will see it … Uploading now" (PSR ¶ 10).  In October 2024, he sent Victim 1 numerous images containing disturbing and sexually explicit material, including

---

[3] Victim 1 is seeking restitution totaling $195, 600 (PSR ¶ 16).

two women eating feces (along with Ibarra's text that read, "Shit in mouth so lovely"), an elderly man performing fellatio on another elderly man, and an elderly man ejaculating (*Id.*).

On at least one occasion, Ibarra sent Victim 1 threatening messages while she was reporting the news live (PSR ¶ 12).  The messages referenced Victim 1's exact location where she stood during the broadcast and claimed that he was behind her and planned to hit her head with a baseball bat (*Id.*). At that moment, a security guard approached Victim 1 from behind causing Victim 1 to shriek audibly in fear (*Id.*).

As a result of the fear and anxiety caused by Ibarra's harassing behavior, Victim 1 quit her on-air position at the political news organization[4] (*Id.*). Victim 1 started seeing a psychiatrist and began taking prescription medication for her anxiety (*Id.*).  She also moved her residence and now lives in an apartment that provides round the clock security (*Id.*).

**B.  Victim 2**

In March of 2023, Ibarra also began sending Victim 2 harassing and threatening messages (PSR ¶ 7).  Victim 2 worked for the same news organization as Victim 1 (*Id.*).  Victim 2 began receiving threatening messages after she attended a work conference in Washington, D.C. (*Id.*). In April of 2023, Ibarra told her that there was a multi-million bounty on her head from the "Illuminati Elite team" (PSR ¶ 9).  In May 2023, he warned, "im giving you an early heads up don't take this lightly … you were sold to a over seas master in Europe … If they find you and capture you its all over my recommendation is stay off grid and start moving now somewhere else you don't have much time" (*Id.*).  The next day, he stated, "I told you to stay off grind and you keep posting when they find you and fuck your brains out don't cry I told you …" (*Id.*).

---

[4] The Government anticipates that Victim 1 will testify at the restitution hearing that after leaving her job, she was no longer able to work in the field of on-air broadcasting due to her fears and anxiety.  As a result, she obtained a new job in a different field of work.  Her employment change has resulted in a significant pay decrease.

In May 2023, Ibarra also told Victim 2 that she had a "good looking ass you have when you are in the shower" (PSR ¶ 9).  Two days later, he told her, "what a good looking … pussy you have WoW I am blown away please bend some in the shower … spread your ass a bit when you soap … it" (*Id.*).  Five days later, he informed her that the "Illuminating elite team" has all seven of her addresses (*Id.*).  He then listed Victim 2's addresses (*Id.*).  In July of 2024, he claimed that the "Illuminating Elite team" had "exclusive nudes" of her in the shower (PSR ¶ 10).  Like Victim 1, Ibarra threatened to send the images to "everyone in the Florida rally today" if she didn't comply with his demands (*Id.*).  As a result of Ibarra's criminal actions, Victim 2 suffered constant fear and anxiety (PSR ¶ 12).  She has reported that her professional reputation has been harmed by virtue of Ibarra contacting several of her co-workers and contractors (*Id.*).

On November 22, 2024, Ibarra confessed to law enforcement that he had been sending the victims threatening and harassing messages since 2020 or 2021 (PSR ¶ 14).  He explained that he saw them broadcasting the news on the Presidential Election of 2024 (*Id.*).  He believed that the victims were not reporting the news fairly to President Elect Donald J. Trump (*Id.*).  As a Trump supporter, Ibarra sent the threatening messages as retaliation for his perceived unfair reporting (*Id.*).

### C.    Advisory Guideline Calculations

The United States Probation Office prepared a thorough PSR.  Defendant's base offense level under *U.S.S.G.* § 2A6.2(a) begins at 18 (PSR ¶¶ 22, 28).  He received a two-level increase for the offense involving numerous aggravating factors (PSR ¶¶ 23, 29).  Under the grouping rules of Chapter 3 of the Sentencing Guidelines, the guideline calculations for each victim are grouped separately thereby adding two levels to the calculations (PSR ¶ 36).  With an adjusted offense level of 22 and a three-level reduction for acceptance of responsibility, Ibarra's total offense level is 19

(PSR ¶ 41).  With a Criminal History Category I, his advisory guideline range is 30 to 37 months' imprisonment (PSR ¶ 86).  In light of the 18 U.S.C. § 3553(a) factors, the United States believes that a sentence at the low end of the advisory guidelines is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## LEGAL ANALYSIS AND RECOMMENDATION

### I.      Generally Applicable Legal Principles

The principles of sentencing are well established. A defendant found guilty of an offense *must be* sentenced in accordance with 18 U.S.C. §§ 3551–3559 "so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case." 18 U.S.C. § 3551(a); *See United States v. Gall*, 128 S. Ct. 586, 596 (2007).   And those subparagraphs in turn provide that a district court *must* impose a sentence sufficient, but not greater than necessary ... (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).

The Supreme Court has characterized these purposes as retribution (punishment), deterrence, incapacitation, and rehabilitation. *See Rita v. United States*, 551 U.S. 338, 347–48, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). And in fulfilling sentencing's purposes, a district court *must* consider and weigh (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing

Commission; (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need for restitution. 18 U.S.C. § 3553(a). Within the context of these requirements, however, a district court has considerable discretion to select the particular sentence to impose. *See United States v. Booker*, 543 U.S. 220, 233, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

## II.     Section 3553 Analysis

A review of the sentencing factors set forth in Section 3553 indicates that a sentence within the advisory guideline range is sufficient, but not greater than necessary, to achieve the goals of sentencing.  Cyberstalking is a serious crime that calls for serious punishment. *United States v. Yung*, 37 F.4th 70, 83 (3rd Cir. 2022).  Thus, a guideline sentence would accurately reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  Ibarra is also a recidivist who committed similar threatening conduct toward two other women who obtained orders of protection against him.  Finally, similarly situated defendants have routinely received sentenced within the guidelines for cyberstalking offenses.  Therefore, the sentencing factors considered in their entirety weigh heavily in favor of a guideline sentence.

### A.   The Nature and Circumstances of the Offense

For years, Ibarra engaged in a pattern of abusive and threatening behavior toward two women with whom he never met.  On numerous occasions, he sent unwanted text messages claiming that the "Illuminati Elite Team" was watching them and demanded that they "obey us." He told them to "stop posting shit on Instagram" and not to "fuck up," or else their "lil princess brains is all over the fucking floor."  He also threatened Victim 1 by telling her that if she "fuck[s] up" the next time she goes live on the air, she will never see her underage daughter ever again.

To exacerbate his terror, Ibarra also sent the victims obscene material and threatened sexual violence against them.  He told them that hidden cameras had been installed in their showers and that the "Illuminati Elite Team" had "exclusive nudes" of them.  He threatened to "expose" them to "everyone in the Florida rally" if they didn't comply with his demands.  He commented on their naked bodies and instructed them to perform sex acts in the shower.  He sent them sexually explicit images of elderly people and grotesque images of two women eating feces.  He also listed their home addresses to show them that he knew where they lived.

Our courts have long recognized that cyberstalking and threats of violence are serious offenses.  *See*, *e.g.*, *United States v. Alhindi*, 22-cr-80085-AMC, Docket Entry 89 (S.D. Fla, January 31, 2024) (Court finds important governmental interest supporting involuntary medication for competency purposes, in part, because defendant charged with "serious crimes," specifically, five counts of cyberstalking that span multiple months involving ongoing threats of violence); *United States v. Fluery*, 19-cr-60056-RAR, Docket Entry 185 (S.D. Fla, May 28, 2020) (in sentencing defendant on three counts of cyberstalking and one count of making an interstate threat for harassing and threatening the victims' families from the shooting massacre at Marjorie Stoneman Douglas High School, the court described defendant's crimes as "a serious offense"); *Young*, *supra*, 37 F.4th at 83.

Many courts have also held that cyberstalking is a crime of violence for purposes of the Bail Reform Act under 18 U.S.C. § 3142(f)(1)(A). *United States v. Shrader,* No. 1:09–cr–00270, 2010 WL 503092, at *3 (S.D. W.Va., Feb 8, 2010); *United States v. Neuzil,* No. 09–CR–2020–LRR, 2009 WL 2030373, at *2 (N.D. Iowa, July 13, 2009). Additionally, the Sixth Circuit Court of Appeals accepted that cyberstalking is a crime of violence when considering whether the Government had proven a charge under 18 U.S.C. § 924(j) regarding the use or possession of a

firearm during and in relation to a crime of violence. *See United States v. Moonda,* 347 F.App'x 192, 201 (6th Cir.2009).

To accurately reflect the seriousness of the crime, courts have imposed prison sentences routinely for cyberstalking.  *See*, *e.g.*, *United States v. Martin*, 2025 WL 411637 (D. Mn., February 6, 2025) (46-month prison sentence for defendant cyberstalking his ex-wife and his ex-wife's step-father); *United States v. Dennis*, 132 F.4th 214 (2nd Cir. 2025) (24-month sentence on three counts of cyberstalking for defendant who sent threatening electronic messages to his former law partners); *United States v. Yung*, 37 F4th 70 (3rd Cir. 2022) (defendant sentenced to nearly four years in prison plus three years of probation and restitution totaling $200,000 for harassing alumnus that university used to interview defendant as a student); *Fluery*, *supra*, 19-60056-RAR (66-month sentence for defendant convicted of three counts of cyberstalking and one count of interstate threats for harassing the victims of the Marjorie Stoneman Douglas High School massacre); *United States v. Sayer*, 748 F.3d 425, 428 (1st Cir. 2014) (defendant sentence to the statutory maximum of 60 months' imprisonment for cyberstalking his ex-girlfriend for over four years, including posing as her online and having anonymous third parties show up at her house seeking "sexual entertainment").[5]

Consistent with this precedent, this Court undoubtedly will recognize that Defendant's crime was serious.  Ibarra's years long harassment and explicit violent sexual threats caused both victims significant pain and anxiety.  As a result, the victims have suffered harm to their professional reputations and impairment to their quality of life.  For example, Victim 1 had to quit her job as a result of Ibarra's threats.  She obtained treatment from a mental health professional to

---

[5] According to a recent study, the median prison sentence for cyber stalkers in 2024 wis 30 months. Sheridan, Max, "The Latest Cyberstalking Statistics for 2024," December 18, 2024.   For the average victim, cyberstalking lasted 12 months. *Id.*

help cope with her mental and emotional injuries.  She got a new phone number, installed security cameras at her father's home, and moved into an apartment in a building that provides round the clock security (PSR ¶ 16).

Additionally, the graphic nature of Ibarra's threats, including threats to kill a minor child, reflects a serious risk to public safety, which is not diminished by his neurodevelopmental profile. As such, the nature and circumstances of the offense weigh heavily in favor of a guideline sentence.

### B.   The History and Characteristics of the Defendant

#### 1.   Defendant's History Includes Cyberstalking Two Other Women

Ibarra's history also weighs heavily in favor of a guideline sentence.  During the instant offense, Ibarra sent threatening messages to two other women.  According to the PSR, both women obtained permanent injunctions for protection against him (PSR ¶ 52).  One of the victims was Ibarra's neighbor (hereinafter referred to a "Prior Victim 1") (PSR ¶ 48).  She reported that Ibarra had been harassing her, stalking her, and watching everything she does inside her home for over 14 years (PSR ¶ 49).  She believed that he may have even hacked into her cameras because he seemed to know how the inside of her house looked (*Id.*).  She reported that in February 2023, Ibarra sent her a text message that read, "last warning I have your entire life and other around you in my hands … This is your last chance to save yourself and everyone around you … There's one person that can destroy everything you have, and that's me" (PSR ¶ 48).  He also threatened to "drive to your address in one hour" and claimed to "have a shower video of you uploaded right now."

The other victim was Ibarra's former classmate (hereinafter "Prior Victim 2").  She reported that Ibarra had been harassing and stalking her for about 10 years (PSR ¶ 51).  She also reported that in February 2023, Ibarra sent her multiple text messages, including the following: "I am doing this out of respect, you need to end all of the lies you started about me with [Prior Victim

1] before I put out information that is going to put both of you on edge" and "I am going to come after you both for it, I am talking about assets and more valuable stuff" (PSR ¶ 50).

Prior Victim 2 also alleged that Ibarra had been harassing her family too, and that he may have hacked her phone (PSR ¶ 51). She reported that he used her phone number and pretended to be her while attempting to get minor children to meet up with him (*Id.*). She stated that she had Multiple Sclerosis and wound up in the hospital numerous times from the stress that Ibarra caused (*Id.*).

Therefore, Ibarra's history demonstrates a pattern of victimizing women over an extensive period of time. He has also shown an ability and willingness to be undeterred by court intervention. After receiving the orders of injunction of protection for the his first two victims, Ibarra was on clear notice that his conduct is intolerable. Nonetheless, he continued his abusive and threatening behavior against two more women. This history weighs heavily in favor of severe punishment in the instant case.

### 2. Defendant's Characteristics, Including his Medical Condition, Does Not Strongly Support a Downward Variance.

Ibarra has filed a motion for a downward variance based largely on his medical condition.[6] It should be noted up front that there is no evidence that Ibarra's criminal conduct was caused by his medical condition. Moreover, there is no evidence that his condition will prevent him from caring for himself while incarcerated. Although he may face challenges in prison due to his condition, those challenges are not unlike the challenges faced by numerous other defendants with similar conditions who have been sentenced to prison for the same or similar crimes. Thus, Ibarra's medical condition does not weigh heavily in favor of a sentence below the advisory guidelines.

---

[6] The Government's arguments and details about the Defendant's medical history has been filed under seal as Attachment A to this memorandum.

### a.   Ibarra's Medical Condition is Unrelated to his Criminal Conduct

The government recognizes that "[I]n meting out appropriate punishment, the court should make a good-faith attempt to ensure that the defendant is not inappropriately punished for having a disease," disorder, or disability. *United States v. Mosley*, 277 F. Supp. 3d 1294, 1296 (M.D. Ala. 2017) (Thompson, J.). Thus, courts have granted variances to defendants whose offense conduct was driven by drug addiction, *see, e.g., United States v. Mosley*, 312 F. Supp. 3d 1289, 1292-95 (M.D. Ala. 2018) (Thompson, J.), the lingering effects of childhood trauma, *see United States v. Carter*, 506 F. Supp. 3d 1204, 1210-14 (M.D. Ala. 2020) (Thompson, J.), and post-traumatic stress disorder incurred in the workplace, *see United States v. Oliver*, 608 F.Supp.3d 1113, 1117-19 (M.D. Ala. June 17, 2022) (Thompson, J.).

However, Ibarra has not provided this court with any evidence that his criminal conduct was caused by his medical condition.[7]   Moreover, despite his medical condition, Ibarra demonstrated sophisticated behavior that allowed him to torment his victims for years.  First, he obtained the personal cell phone numbers of the victims who worked as broadcasters for an online political news organization.  He then used a messaging application to send text messages.  The App concealed his identity by utilizing a variety of different telephone numbers that showed up on the victims' caller identification.  By doing so, Ibarra left the victims with the false impression that they were receiving messages from many different people.  Moreover, the victims were unable to report any phone number linked to Ibarra.  This evidence clearly demonstrates that Ibarra knew the wrongfulness of his conduct and took steps to avoid detection.

Therefore, absent evidence that Ibarra's criminal actions were caused by his medical condition, the existence of the condition should serve a little basis for a downward variance.  See,

---

[7] See Attachment A for more detailed analysis of case law relative to Ibarra's specific medical condition.

e.g., *United States v. Fitzpatrick*, 126 F.4th 348 (4th Cir. 2025); *United States v. Boukamp*, 105 F.4th 717 (5th Cir. 2024); *United States v. Lucarell*, No. 22-3732, 2023 WL 3756191 at *2 (6th Cir., June 1, 2023); *United States v. Zuk*, 874 F.4th 398 (4th Cir. 2017).

> **b.  Ibarra Has Not Demonstrated that his Medical Condition Makes Him Extraordinarily Susceptible to Decompensation or Abuse in Prison.**

Next, Ibarra claims that his medical condition renders him extraordinarily vulnerable in prison.  The Supreme Court has spoken approvingly of downward 'departures' under U.S.S.G. § 5H1.4--which provides that "an extraordinary physical impairment may be a reason to depart downward"--in cases where a defendant's physical condition renders him especially susceptible to victimization in prison. *See, Koon v. United States*, 518 U.S. 81, 111-112, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (allowing departure where defendants' notoriety and status as police officers rendered them unusually susceptible to abuse in prison). *See also United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (allowing a departure under U.S.S.G. § 5H1.4 and U.S.S.G. § 5K2.0(a)(2)(B)--the Guidelines subsection authorizing departures based on "a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence"--where the defendant's "immature appearance, *sexual orientation and fragility" rendered him especially vulnerable to abuse in prison); *United States v. Long*, 977 F.2d 1264, 1278 (8th Cir. 1992) (allowing a departure under § 5H1.4 where the defendant's frail health left him "exceedingly vulnerable to possible victimization and resultant severe and possibly fatal injuries"); *United States v. Spring*, 108 Fed. App'x 116, 125 (4th Cir. 2004) (allowing a departure under § 5H1.4 on the basis of the defendant's "extreme vulnerability to prison abuse").

Here, Ibarra has failed to demonstrate that his medical condition makes him particularly susceptible to abuse or decompensation.[8]  Although his medical condition may present some challenges while incarcerated, Ibarra's history demonstrates an ability for self-care.  His mother has described him as "high functioning."  For years prior to his arrest, his mother worked outside the home.  During those times, Ibarra has demonstrated an ability to take care of himself while home alone.

Ibarra's medical history does not include any disabling conditions, such as anxiety, depression, or psychological issues.  He does not have a history of taking medication or receiving therapy to help him deal with his adaptive functioning.[9]  As demonstrated in more detail in Attachment A, Ibarra does not present himself with the kind of health deficiencies that court's have recognize would make him particularly susceptible to decompensation or abuse in prison.  *See*, *e.g.*, *United States v. Knott*, 638 F.Supp.3d 1310 (M.D.Al., September 1, 2022).

Finally, Ibarra does not claim that the Bureau of Prisons (hereinafter "BOP") is not capable of providing him necessary care.  BOP houses inmates in general population of standard prisons who have a variety of disabilities, including the elderly, blind, low IQ, and wheelchair-bound persons.  If an inmate is unable to perform their normal activities of daily living alone, the BOP can house the inmate in a facility that provides "inmate companions."  Moreover, many federal prisons have ADA accommodations, mental health units, and specialized support services for inmates with developmental or intellectual disabilities.  They also offer protective custody units or

---

[8] *See* Exhibit A.
[9] Adaptive functioning refers to those skills that are necessary for persons to navigate through the demands that are placed on us by our environments in a way that is effective. https://www.advancedpsy.com/documentation/adaptive-functioning.

infirmary-level housing which reduce the risk of victimization for vulnerable inmates while still maintaining standard incarceration.

Therefore, despite his intellectual disabilities, Ibarra has the ability to function in a correctional environment.  He can perform normal activities of daily living and provide himself with sufficient self-care, as evidence by his psychological evaluations which show adequate adaptive functioning.  Under these circumstances, Ibarra's medical condition is not an overly persuasive basis to warrant a significant downward departure.

### C.  Need for the Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense.

In sentencing the defendant, the court must consider the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2).  As explained above, cyberstalking is a very serious offense.  As such, a prison sentence is needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### D.  Afford Adequate Deterrence to Criminal Conduct.

The need to deter Ibarra's criminal conduct is strong.  For specific deterrence, Ibarra risk of reoffending is high – he has already demonstrated a refusal to cease his criminal conduct, despite receiving sanctions from the courts.  On March 7, 2023, a state court judge issued a permanent injunction again Ibarra preventing him from having any further contact with his two prior victims (PSR ¶51).  Instead of being deterred, Ibarra shifted his focus to Victims 1 and 2 and continued to cyberstalk them for at least another 20 months up and until his arrest in this case in November 2024.  A sentence within the advisory guideline range would send a strong message to this defendant that his harassing and threatening behavior is unacceptable in any civilized society.

14

The need for general deterrence is also strong. Cyberstalking is all too common. Approximately 1.5 million people 16 or older (about 0.6 percent of the U.S. population) were cyberstalking victims in 2019 alone, according to the Bureau of Justice Statistics (BJS). However, more recent figures estimate that as many as 7.5 million people now experience cyberstalking annually. https://www.safehome.org/data/ cyberstalking-statistics. Unfortunately, cyberstalking is a vastly underreported crime. A 2021 review of cyberstalking research noted victimization percentages that ranged from 6.5 percent to nearly 41 percent across various studies. Sheridan, Max, "The Latest Cyberstalking Statistics for 2024," December 18, 2024.

Despite its underreporting, cyberstalking often causes victims severe mental and emotional pain on its victims. To protect them, court should impose sentences that send a strong message to the public that cyberstalking will result in serious consequences. A sentence within the guidelines will achieve that result.

### E.  A Guideline Sentence Would Avoid an Unwarranted Sentence Disparity Between Similarly Situated Defendants

In similar cases involving defendants with similar medical conditions, court have routinely imposed guideline sentences. To do otherwise would create an unwarranted sentence disparity between similarly situated defendants. For example, Your Honor recently sentenced a 30-year-old man with severe mental health issues within the guidelines on a conviction for cyberstalking. *See United States v. Daniel Cody Pittman*, 23-cr-80121-DMM.[10] In *United States v. Carbonaro*, 2023 WL 4118575 (3rd Cir. 2023), the court imposed a guideline sentence of 265 months for a defendant convicted of producing, possessing, and distributing child pornography, despite defendant's serious medical conditions, including ADHD, Tourette's Syndrome, a possible

---

[10] Pittman's medical history is documented in his PSR at Docket Entry 43. To protect Pittman's medical privacy, the government does not include the details of Pittman's medical conditions in this Response.

bicipital brain dysfunction, and Asperger's Syndrome.

In *United States v. Ricker*, 983 F.3d 987 (8th Cir. 2020), the appellate court held that a sentence of 600 months' imprisonment for an autistic man on charges of sexually abusing children was not to be unreasonable.

In *Fluery*, *supra*, the district court sentenced defendant with autism to 66 months' prison where guideline range was 57 to 71 months on three counts of cyberstalking and one count of interstate threats for harassing the families of the Marjorie Stoneman Douglas High School massacre.

Finally, in *United States v. Morais*, 670 F.3d 889, 892 (8th Cir. 2012), the court imposed a low-end guideline sentence of 97 months for two counts of receiving child pornography for defendant who suffered from "'mind blindness,' which makes it difficult for him to 'perceive, predict, and react appropriately to another person's thoughts, emotions, et cetera, to be able to put yourself in another person's shoes.'"

In each of these cases, the defendants presented themselves with mental health disorders similar to or greater than Ibarra. In many of those cases, the defendants had no criminal history and argued that they are particularly susceptible to abuse or decompensation due to their disabilities. In each case, the courts applied all sentencing factors and determined that a sentence within the guidelines was nonetheless appropriate.

In support of his request for a downward variance, Ibarra relies primarily on two cases: *United States v. Knott*, 638 F.Supp.3d 1310 (M.D.Al., September 1, 2022) and *United States v. Huseth*, 2021 WL 4940915 (D.Ks., 2021). While these cases provide a few isolated examples of low sentences, their persuasive value is also low because both outcomes are outliers. As

demonstrated in Exhibit A, most defendants who share Ibarra's medical condition have received significant prison sentences for the same of similar crimes.

Additionally, *Knott* and *Huseth* are distinguishable from the instant matter.  In *Knott*, 638 F.Supp.3d 1310, the defendant was charged with one count of possession of child pornography for possessing thousands of images and videos. *Id.* at 1312.  At sentencing, Knott's advisory guideline range was 27 to 33 months' imprisonment. *Id.* at 1315. The district court noted that a doctor testified that Knott, "given the specific circumstances of his ASD, is vulnerable to decompensation if held in a prison setting." *Id.* at 1321.  In particular, the court found credible the doctor's testimony that Knott is likely "to decompensate--and to experience mental deterioration--if he is not able to receive the same frequency and quality of mental-health treatment that he has received in the community." Id.  When balanced against the sentencing factors, the court found that incarceration was not necessary to accomplish the goals of sentencing.  *Id.* at 1322.  It explained that Knott's risk of recidivism is low - and that it will be lowered further by individualized counseling from a therapist trained to treat patients with ASD, which Knott is unlikely to receive in prison. *Id.*  It also noted that Knott will live for the rest of his life as a registered sex offender, with severe restrictions on his residence, movements, activities, and associations. *Id.*

Finally, the court noted Knott's unique condition:

In the almost two years that have passed since he was diagnosed with ASD, Knott has begun to make progress in therapy. His need for such treatment is urgent as his depression has worsened dramatically since he has come to understand the impact of his crime. As defense counsel described during an on-the-record status conference, Knott becomes so distressed when speaking about his crime that he scratches at his face uncontrollably and, as Knott explained to Dr. Babcock, "he cannot remember what it feels like to feel happy with himself.

*Id.* at 1323.  Therefore, the court sentenced Knott to 27 months' home detention as one of the conditions of seven years of supervised release. *Id.* at 1310.

In the instant case, Ibarra has presented no evidence that he likely will decompensate if incarcerated. Prior to his arrest in this case, he was not receiving any mental health services or taking medication. Nonetheless, his mother describes him as "high functioning." Moreover, he has demonstrated an ability to provide self-care, as evidence by his mother being able to work outside the home. Ibarra does not have a history of depression or any other concomitant conditions that require care that the Bureau of Prisons cannot provide. Therefore, the unique concerns addressed by the court in Knott largely do not apply to Ibarra.

In *Huseth*, 2021 WL 4940915, a 32-year-old man plead guilty to possession of child pornography for being found with over 12,000 images and videos of infants, toddlers, children, and teenagers, including those that depicted sadistic or masochistic conduct). In his motion for substantial downward variance and substantial departure downward, Huseth cited his ASD, his significant cognitive impairments, his particular vulnerability to manipulation due to ASD, and his need for treatment for ASD. Huseth requested a sentence of probation instead of 8–10 years in prison as the sentencing guidelines suggested. In contrast, the government advocated for a sentence reduced only to 6.5 years.

Due to the expert testimony, the court found that Huseth's ASD and associated severe cognitive deficits significantly impaired his ability to fully appreciate the wrongfulness of possessing and viewing child pornography. The court also worried that he would face bullying and injury in a prison environment. The court also found that Huseth did not have Pedophilic Disorder, so a probation sentence with treatment and therapeutic conditions tailored to his ASD and sex offenders was sufficient to satisfy statutory sentencing requirements, because the sentence

adequately addresses the need for therapeutic treatment, there was a low risk of recidivism, and there was little need to protect the public from Huseth's further crimes.

Once again, Ibarra's medical condition is distinguishable from this case. There is no evidence that Ibarra's condition that has cause him to lack appreciation for the wrongfulness of his conduct. Additionally, unlike *Huseth*, Ibarra poses a high risk of recidivism and there is a strong need to protect the public from his further crimes.

### F. A Sentence of Home Detention is Unwarranted

Ibarra is seeking a sentence of home detention. As demonstrated above, a sentence of home detention would not satisfy the goals of sentencing. Additionally, as demonstrated by the government's analysis of the case law in Exhibit A, a sentence of house arrest would fall outside the typical sentenced imposed by the courts of individuals who suffer from maladies similar to the defendant.

Moreover, sentencing Ibarra to home detention into the custody of his mother is unwarranted. Ibarra's mother has demonstrated a complete lack of appreciation for the wrongfulness of her son's conduct. In her letter to the Court, she claims that she is "sorry" for the victims and that she "understand[s] the seriousness of this moment." (DE 34, p.3). However, when questioned by the probation officer, she characterized her son's conduct in this case as "convoluted game talk" (PSI ¶ 54). The extent of her minimization and denial of the harmfulness her son's criminal conduct is alarming. Clearly, she is not suitable to supervise Ibarra on house arrest.

### G. Conclusion

Ibarra's criminal conduct consisted of repeated, prolonged, and calculated targeting of vulnerable victims, including a child. It demonstrates intent and persistence. His tenacity and ability to send text messages repeatedly from a messaging app that concealed his phone number

demonstrate mental and social sophistication unmitigated by his medical history.  The BOP is more than capable of housing him in an environment that will neither expose him to substantial risk of decompensation or abuse.

Based on the sentencing factors of 18 U.S.C. 3553, the government respectfully requests this court impose a sentence of 30 months' imprisonment, which is at the low end of the advisory guideline range, followed by three years of supervised release.  This sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The factors that support this recommendation include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to the criminal conduct; and to avoid an unwarranted sentence disparity with similarly situated defendants.

Respectfully submitted,

HAYDEN O'BYRNE
UNITED STATES ATTORNEY

By:      */s/ Mark Dispoto*
          Mark Dispoto
          Assistant United States Attorney
          Court Id. No A5501143
          500 South Australian Avenue
          West Palm Beach, Florida 33401
          Tel: (561) 209-1032
          Mark.dispoto@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on May 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Mark Dispoto*
Mark Dispoto
